The Rappold Company v. Commissioner.
Rappold Co. v. Commissioner
Docket No. 23393.
United States Tax Court
1950 Tax Ct. Memo LEXIS 49; 9 T.C.M. (CCH) 1008; T.C.M. (RIA) 50270; November 8, 1950
Sidney N. Weitz, Esq., 940 Leader Bldg., Cleveland 14, Ohio, for the petitioner. Lawrence R. Bloomenthal, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner seeks a redetermination of deficiencies in income, declared value excess profits, and excess pronts taxes as follows: Declared Value
Excess Profits
Excess
Fiscal Year Ended
Income Tax
Tax
Profits Tax
Total
January 31, 1943
$ 340.23
$ 733.39
$1,073.62
January 31, 1944
301.34
4,071.79
4,373.13
January 31, 1945
185.82
$10.04
137.09
332.95
January 31, 1946
1,405.17
30.24
1,435.41
$2,232.56
$10.04
$4,972.51
$7,215.11
The only question is the propriety of respondent's treatment as dividends on preferred stock, and his consequent disallowance *50 of deductions claimed by petitioner to be interest payments on debentures. Other adjustments are not contested. The case was submitted on a stipulation of facts and other evidence. Findings of Fact The stipulated facts are hereby found. Petitioner, an Ohio corporation engaged at Warren, Ohio, in the operation of a department store, filed its returns for the fiscal years ended January 31, 1943, 1944, 1945, and 1946 with the collector for the eighteenth district of Ohio. The returns were prepared on an accrual basis of accounting. Prior to February 1, 1939, O. S. Rappold had been employed in department store enterprises for about 35 years. In 1930 he left R. H. May Co. and began employment for The Halle Bros. Co., hereinafter called Halle, which had a branch store in Warren. For the six years immediately preceding February 1, 1939, Rappold served as manager of the Warren store. Several of the Halle stores, including that situated in Warren, were unprofitable ventures and some of them were closed. As of February 1, 1939, Rappold began conducting business in the Warren store under his own name. As of the same date he organized petitioner. Its authorized capitalization consisted *51 of 5,000 shares of no par value common stock and 600 shares of "Cumulative Preferred Stock of $100 par value." Rappold has at all times been the largest holder of the common stock. The other principal common stockholders are W. F. Parker, W. F. Thorne Pendleton, and Henry Krause. By a written "offer of sale," dated February 18, 1939, Halle offered to sell to "The Rappold Co. of Warren, Ohio" (petitioner), its Warren store with fixtures and inventory at a price of $98,180.21. The consideration asked consisted of - "* * * Forty Thousand One Hundred Eighty Dollars and Twenty One Cents ($40,180.21) in cash and Five Hundred Eighty (580) shares of the Cumulative Preferred Stock of The Rappold Company authorized to be issued by its Articles of Incorporation, and issued, executed and delivered in a manner satisfactory to The Halle Company, * * *." By a written "Bill of Sale," dated March 3, 1939, reciting a consideration of $40,180.21 cash and "Five Hundred Eighty (580) shares of its [petitioner's] Cumulative Preferred Stock," Halle transferred to petitioner all property connected with the Warren store. Petitioner paid the purchase price by delivering to Halle $40,180.21 in cash and *52 $58,000 in a series of 12 certificates designated "Cumulative Preferred Stock." Petitioner began operating the store as of March 3, 1939. During the interval between February 1, 1939, and March 3, 1939, Rappold had operated the store business under his own name and had bought merchandise on credit in the amount of about $25,000. Prior to February 1, 1939, Rappold had established no credit for himself or for any business which he owned. It was by reason of personal friendships and a reputation for fair dealing that he was able to borrow sufficient funds on his personal notes to commence operations. In his discussions with a representative of Halle prior to completion of the sale, Rappold understood that the $58,000 was to be repaid. Rappold was not concerned about the "form" of the arrangement. He took the position that anything satisfactory to Halle was satisfactory to him. He read the offer of sale before endorsing his acceptance on it, but he did not inquire of anyone concerning the difference between cumulative preferred stock and debentures. Rappold's own attorney and accountant examined and approved without objection the bill of sale, the "preferred stock" certificates, and *53 petitioner's articles of incorporation. Except for Rappold, petitioner's common stockholders were not familiar with the terms of the shares being issued to Halle at the time they agreed to purchase the common stock. They learned of the terms at a later date, but before the Halle shares were redeemed. Of the 600 shares of authorized cumulative preferred stock, 580 shares were issued by petitioner to Halle and were evidenced by the 12 certificates. Each certificate purported to represent "fully paid and non-assessable Cumulative Preferred shares of the par value of One Hundred Dollars each of THE RAPPOLD COMPANY transferable on the books of the COMPANY by the holder hereof in person, or by duly authorized attorney, upon the surrender of this certificate properly endorsed." Each certificate stated that by acceptance the holder became subject to the "designations, preferences, rights, voting power, and restrictions of the Common and Preferred shares in the Company * * * printed on the reverse side hereof * * *." The printed data on the reverse side of each certificate included petitioner's Articles of Incorporation, Article V, Section 2, captioned "Terms and Provisions of Shares." *54 The Articles of Incorporation and certificates did not specify a maturity date, and did not contain any provision authorizing the preferred holders to maintain an action to recover either the principal amount or the amounts designated "dividends." The holders were entitled to receive "when and as declared by The Board of Directors" dividends "cumulative from February 1, 1939" of $5.00 per share per annum, payable in equal quarterly installments on the first of January, April, July, and October. Dividends on common stock were not to be declared or paid if petitioner had failed to meet a quarterly dividend on the "Cumulative Preferred Stock" for a previous year, "whether or not earned or declared"; failed "to pay and declare and appropriate surplus" to meet the dividends for the current quarter; failed to redeem at least one-twelfth of the "Cumulative Preferred Stock" in each year; or failed to maintain net current assets equal to at least 100 per cent of the aggregate par value of "Cumulative Preferred Stock" outstanding. Petitioner was privileged to redeem the "preferred shares" at any time by payment of $100 per share "plus an amount equal to accrued unpaid dividends to the date *55 of redemption." Shares so redeemed were to be cancelled and not reissued. Petitioner was obligated on April 1 of each year beginning 1941 and ending 1952, to redeem "out of the then surplus of the aggregate of its assets over the aggregate of its liabilities plus stated capital" not less than one-twelfth of the outstanding "Cumulative Preferred Stock." If petitioner chose to redeem more than one-twelfth during any year the excess might, at option of the board of directors, be credited to requirements for subsequent years. If less than one-twelfth was redeemed in a given year, "the deficiency shall be redeemed out of the surplus of the aggregate of its assets over the aggregate of its liabilities plus stated capital before any dividend shall be paid upon or set apart for the Common Stock, so that the purchase obligation shall be cumulative." Upon dissolution or other termination of petitioner's affairs the holders of the "preferred shares" were entitled to a distribution of cash "whether from capital, surplus or from earnings" equal to the redemption price plus accrued dividends before any distribution to the common stockholders. The certificates further required that while shares *56 of the "preferred stock" were outstanding petitioner could not without written consent of two-thirds of the holders thereof issue bonds, notes, debentures or other indebtedness of a term longer than 12 months; mortgage or otherwise permit a lien upon its property or assets; or "issue shares of stock having priority over or on a parity with the preferred." Petitioner was required to maintain net current assets in an amount equal to at least 100 per cent of the par value of outstanding "preferred stock." At any time while Halle was owner of at least $25,000 in par value of the stock, and (1) the "dividends" were in arrears for a four-quarter dividend period; or (2) petitioner had failed to redeem at least one-twelfth of the stock in any year; or (3) petitioner had not complied with its agreements concerning the maintenance of net current assets, and the procuring of two-thirds vote of "preferred stockholders"; then "thereafter the holders of such Cumulative Preferred Stock shall be entitled to the exclusive voting power (in all respects) of the outstanding shares of stock of the corporation." These special voting rights were to terminate only when the defaults which caused them to arise *57 had been removed. In addition, and at all times, the holders of "cumulative preferred" were entitled to "exclusive voting power" in the election of one or two directors of petitioner, depending upon whether petitioner had a total of less or more than five directors, respectively. While "preferred stock" remained outstanding, the certificates limited annual dividends upon the common stock to $5,000 unless for that year petitioner had placed in a sinking fund amounts sufficient to meet the following year's "dividends and * * * redemption provisions" of the "preferred stock." The sinking fund could be appropriated only from "moneys which by law can be applied to the payment of dividends." During the fiscal year ended January 30, 1940, petitioner paid Halle a total of $2,658.33 as "dividends" on the "preferred stock." Petitioner's earnings during the same fiscal year were about $500. The 580 shares of stock issued to Halle were reported on petitioner's books at the time of its incorporation "as a liability dealing with capital." The certificates were held by Halle continuously from the date they were issued until they were redeemed. In compliance with the redemption requirements *58 of the certificates, petitioner paid Halle the following amounts: Date
Payment
February 20, 1941
$4800
July 22, 1941
4800
September 11, 1941
4800
May 7, 1942
4800
July 20, 1942
4800
February 5, 1943
4900
February 25, 1943
4800
February 1, 1944
4800
June 30, 1944
4900
March 27, 1945
4800
Petitioner employed a firm of certified public accountants which examined its books monthly. The accountants did not make or recommend any change in the manner in which the shares issued to Halle were recorded on petitioner's books. No qualifying remarks were inserted in the book entries dealing with the issuance of the shares. Included in audit reports prepared by the accountants each year were balance sheets showing the financial condition as of January 31. Each balance sheet recorded at $100 per share the unredeemed shares issued to Halle under "Net Worth, Capital Stock." In a statement accompanying the audit reports, the accounting firm expressed its opinion that "Due to the peculiar characteristics of this preferred stock and its sole ownership by The Halle Bros. Company, Cleveland, Ohio, arising from the terms of sale to the present Company, this stock actually *59 partakes of the nature of debenture notes, the retirement of which adds to the financial stability of the Company, and to the value of its common shares." Petitioner's payments in redemption of the "Cumulative Preferred Stock" were recorded on its books by a credit to "Cash" and a debit to "Authorized Preferred Stock." At each quarter-annual period following February 1, 1939, petitioner paid Halle $1.25 for each share of the "Cumulative Preferred Stock" then held by it. The payments were recorded on petitioner's books by a credit to "Cash" and a debit to "Interest Expense." The same payments were treated by Halle, on its books, as cash dividends. In its excess profits tax returns for the taxable years petitioner treated as borrowed capital the outstanding certificates of "Cumulative Preferred Stock" and the credit for excess profits tax purposes was calculated upon the average invested capital which included these certificates. In each of its income tax returns for the years in question, petitioner included as "Schedule L" a balance sheet on which the shares issued to Halle were designated "debentures." In the same returns petitioner reported net incomes and claimed deductions *60 for interest, being the $1.25 quarterly "dividend" payments to Halle, as follows: Fiscal Year Ended
Deduction
Net Income
January 31, 1943
$2,075.00
$32,789.19
January 31, 1944
1,210.00
54,138.16
January 31, 1945
847.50
59,304.55
January 31, 1946
591.25
61,782.51
In his notices of deficiency respondent disallowed deduction of the "interest" stating: "(a) in filing your return * * * you claimed an interest deduction * * * for dividends paid on shares of preferred stock issued by you to The Halle Bros. Co., as vendor of the assets acquired at organization of your corporation. It is held that this dividend payment is not an allowable deduction in computing net income. * * *
"(c) Under Item 4, Schedule A of your excess profits tax return * * * you added the amount of * * *, as representing 50% of interest on borrowed capital * * *. Since it is held that the amount * * * represents dividends paid on preferred stock instead of interest paid on borrowed capital, the adjustment had been reversed." The payments in question constituted dividends on preferred stock and not interest on indebtedness. Opinion Except for petitioner's own treatment *61 of the dividend payments, no feature of these securities resembles an interest-bearing debt and all resemble preferred stock. The principal amount had no date when payment was due, ; , affirmed (C.C.A., 7th Cir.), ; redemptions were required, but only out of surplus. , affirmed (C.C.A., 4th Cir.), . The dividends had to be declared, and had to be paid from surplus. See , affirmed (C.C.A., 1st Cir.), , certiorari denied, . Remedy for non-payment was a prohibition on the declaration of common dividends and an increase in voting rights for the preferred, not a suit to recover an indebtedness. And, in fact, voting rights were retained at all times - a usual indication of a stockholder not a creditor relationship. ; ; *62 , affirmed (C.C.A., 9th Cir.), , certiorari denied, . On dissolution, holders could be paid only from capital or surplus. Perhaps most significantly, petitioner agreed not to "create or issue shares of stock having priority over" the securities in question. If they represented an indebtedness, no stock could possibly outrank them and the provision would have been meaningless. Finally, the holder itself treated the receipts on its books as "dividends." That petitioner did otherwise, we think at most the equivalent of a self-serving declaration. There were obvious reasons for retiring the issue as soon as possible and thus leaving the common stock in unqualified control. Since this was to be done in any event, it could as well be treated on the books as the payment of a debt. Any payments other than from surplus seem to us of doubtful legality in view of the express terms of the instrument and the provisions of Ohio law. Page's Ohio General Code Ann., sec. 8623-38. But they were not questioned and it does not appear that anyone was in a position to do so. Creditors, who *63 might have been injured were concededly trusting to the credit standing not of petitioner but of the individual back of it. Altogether, there is nothing to satisfy us that these securities were other than the "Cumulative Preferred Stock" which they were named. . While in respect to excess profits tax no credit can be allowed for "borrowed" invested capital, it appears to be agreed that there is no reason why equity invested capital cannot be appropriately increased in the recomputation. Decision will be entered under Rule 50.